**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Country Mutual Insurance Company, | No. CV-17-02974-PHX-ROS |
| Plaintiff, | **ORDER** |
| v. | |
| Mario Martinez, et al., | |
| Defendants. | |

In May 2012, Lisa Ackert was involved in an automobile accident that resulted in serious injuries to two of her children. At the time, she was insured by Country Mutual Insurance Company. After the accident, the children's father sued Lisa to recover for the children's injuries. Country Mutual defended Lisa but, in Lisa's view, that defense was "woefully inadequate." (Doc. 42 at 3). Believing Country Mutual's actions freed her from her obligations under the insurance policy, Lisa agreed to a judgment being entered against her and assigned her claims against Country Mutual to the children's father. That assignment prompted Country Mutual to file the present declaratory judgment action against the children and their father, seeking a determination that "Lisa breached implied and express terms of the [insurance] Policy [and] forfeited coverage under the Policy."[1] (Doc. 10 at 13). The parties each seek summary judgment. For the following reasons,

_____

[1] Around the same time Country Mutual filed the present action, the children's father filed a declaratory judgment action against Country Mutual in Pinal County Superior. The father sought declaratory judgment that Country Mutual had breached the insurance contract by failing to provide Lisa an adequate defense. That action was removed to federal court and consolidated with the present action. (Doc. 18).

Country Mutual's motion will be granted.

## FACTUAL BACKGROUND

Unless otherwise noted, the following facts are undisputed. On March 27, 2012, Lisa was driving on Ironwood Drive in Pinal County. Two of Lisa's children, A.A and B.A, were in the car with her. A.A. was in the front passenger's seat and B.A. was in a rear seat. (Doc. 68 at 162). A.A. was not wearing a seatbelt. Lisa was going approximately seventy mph, twenty mph above the speed limit, and was traveling behind another vehicle going approximately the same speed. (Doc. 68 at 162). The vehicle Lisa was following changed lanes to avoid a truck towing a horse trailer that had slowed to make a left turn across the median. After the other vehicle changed lanes, Lisa took her foot off the accelerator but did not apply the brakes or steer away from the horse trailer. (Doc. 68 at 173). Lisa's vehicle hit the horse trailer and, as a result of that collision, A.A. was rendered a ventilator-dependent quadriplegic. B.A. was also injured but not as severely.

At the time of the accident, Lisa was covered by an automobile insurance policy issued by Country Mutual. That policy had liability limits of $15,000 per person, $30,000 per occurrence. The policy also had uninsured/underinsured limits of $15,000 per person, $30,000 per occurrence. Shortly after the accident, a Country Mutual adjuster had some contact with Lisa and her family members but the record is not clear regarding what was discussed.

A few months after the accident, Brandon Ackert, the father of A.A. and B.A and Lisa's ex-husband, retained counsel to represent his children regarding the accident. (Doc. 68 at 153). On June 6, 2012, that counsel wrote to Country Mutual. The letter stated the accident "resulted from [Lisa's] negligence" and it asked for a variety of information regarding Lisa's policy. The letter also stated it was "not an attempt to settle this case and no settlement offer [was] on the table." On June 8, 2012, an adjuster for Country Mutual responded to the letter. (Doc. 68 at 156). That letter provided some of the requested information and stated Country Mutual's "investigation shows [Lisa] is at fault for this collision." The letter closed with a vague paragraph regarding payment of the policy limits:

> It does appear that the [sic] each child's claim will exceed our available coverage. The child in the vehicle that was hit also has a bill for a check up that she had as a result of the collision that will need to be considered when the division of the money is addressed. Court approval will be needed and the liens will need to be addressed as well.

(Doc. 68 at 157). According to the adjuster, that paragraph was meant to be read as an offer of the policy limits. (Doc. 70-32 at 37). During her deposition the adjuster explained she did not make a straightforward offer of the policy limits because the circumstances meant the policy limits could not be paid immediately. That is, in the adjuster's view the fact that A.A. and B.A. were minors meant a conservator would have to be appointed before any payments could be made. (Doc. 70-32 at 32). Brandon's attorney admits he did not make a settlement demand to Country Mutual in 2012. In fact, the attorney would not make a settlement demand until 2015. (Doc. 68 at 269, 271).

In February 2013, Brandon filed a lawsuit in the Pinal County Superior Court.[2] (Doc. 68 at 269). That suit was "against Pinal County for the negligent design, construction and maintenance of Ironwood Drive." (Doc. 70-1 at 2). The suit was brought by Brandon on his own behalf as well as on behalf of his two injured children. For the sake of simplicity, the Court will refer to the claims simply as belonging to Brandon. After responding to the complaint, Pinal County identified as non-parties at fault the engineering firm involved in the design of Ironwood Drive, the construction firm that did the work, the driver of the truck towing the horse trailer, and Lisa. (Doc. 70-1 at 2). Brandon then decided to amend his complaint to name those non-parties as parties.

After Lisa was named as a party, Country Mutual agreed to defend her without any reservation of rights. Country Mutual retained attorney Tom Burke to defend Lisa. At that time, Burke had more than 30 years of litigation experience and had defended Country Mutual's insureds for almost twenty-five years. (Doc. 68 at 2). In defending Lisa, Burke concluded the allegations against Lisa were not the focus of the case. (Doc. 68 at 101).

---

[2] Lisa hired counsel and filed her own lawsuit against Pinal County. The parties have not provided information about that separate suit other than the fact it was consolidated with Brandon's suit. (Doc. 70 at 2; 68 at 337).

Rather, Burke believed Brandon's strategy would be to shift all fault to the other parties (*i.e.*, the construction firm, engineering firm, Pinal County, and the driver of the truck towing the horse trailer). Burke's understanding allegedly stemmed from conversations he had with Rob Lewis, Brandon's counsel. The content of those conversations is now disputed. (Doc. 68 at 100).

In pursuing his claims, Brandon hired and disclosed at least five experts. Those experts were to provide opinions on the overall circumstances of the accident, the "design and engineering standard of care," the "construction standard of care," the seatbelt warning system, and the fact that A.A. would have suffered the same injury even if he had been wearing a seatbelt. (Doc. 68 at 193). The expert on the overall circumstances of the accident was Richard M. Ziernicki, Ph.D. (Doc. 68 at 160). Country Mutual now claims Ziernicki's report was especially helpful in establishing Brandon did not believe Lisa was at fault.

According to Ziernicki's report, the purpose of his investigation was to address the circumstances of the accident, including the actions taken by the driver of the truck towing the horse trailer, the design of the road at the accident site and, most crucially for present purposes, "[t]he ability for [Lisa] to avoid the accident." (Doc. 68 at 161). Ziernicki concluded the driver of the truck "created an unsafe situation and an unnecessary hazard that resulted in this accident." (Doc. 68 at 179). Ziernicki also concluded the road had not been constructed according to the plans. That meant the construction firm "created [a] significant hazard on the roadway" by not following the plans, the engineering firm "allowed a significant hazard to be created on the road" by not "verify[ing] compliance of the road construction with the design drawings," and Pinal County "allowed a significant hazard to be created on the road" by either approving the deviation from the plans or not inspecting the road to identify the deviation and requiring it be corrected. (Doc. 68 at 181). As for Lisa, Ziernicki concluded the "published literature" established it takes 2.5 second or longer "to respond to an unexpected hazard on the road." (Doc. 68 at 177). And Ziernicki believed Lisa "did not have enough time to apply the brakes or steer after

recognizing the slow moving trailer." Thus, Lisa's "reactions at the time of the accident [were] within the reasonable range of driver's responses. [Lisa] did not have enough time to avoid the accident."[3] (Doc. 68 at 186).

Upon receiving Brandon's expert disclosures, Burke decided not to retain separate experts. Burke based that decision on his review of the expert disclosures and, according to Burke, conversations he had with Lewis. In Burke's view, the expert disclosures "were wonderful" for Lisa because they shifted all of the blame to the other defendants. (Doc. 68 at 101). Burke allegedly informed Lewis that Lisa's strategy would be to not "get in your way by hiring experts who might create issues for you in the development of the case." (Doc. 68 at 100). In other words, Burke did not want to disclose experts that might conflict with Brandon's litigation strategy. On April 8, 2015, Burke submitted a supplemental disclosure statement regarding experts. That document stated Lisa "has not retained any expert witnesses" but she "reserve[d] the right to elicit opinions from the following witnesses identified by [Brandon]." (Doc. 68 at 191). The disclosure statement then listed Brandon's experts, including Ziernicki, and their expected testimony.

In litigating Brandon's claims, Lewis became frustrated with Burke's allegedly insignificant efforts at defending Lisa. That frustration is only understandable if Brandon's claims were not primarily aimed at Lisa. After all, Brandon was suing Lisa, alleging she was at fault for the accident. If the goal was to prevail against Lisa, Lewis should have been pleased that Burke was not pursuing a vigorous defense of Lisa. But the reality that Lisa was not the true aim of Brandon's claims is illustrated by Lewis's deposition testimony.

During his deposition, Lewis explained how he repeatedly tried to convince Burke to "file a motion for summary judgment on the seat belt issue." (Doc. 70-18 at 3). That motion would have "limit[ed] the allocation of fault based upon the seat belt." (Doc. 70-

---

[3] Despite Ziernicki concluding Lisa's reactions were "reasonable," Brandon now argues "Ziernicki's opinions do not support that Lisa's actions leading up to the accident were reasonable." (Doc. 78 at 2). Brandon has not explained how he is reading Ziernicki's opinions as imposing fault on Lisa. Nor has Brandon pointed to another expert who imposed fault on Lisa.

18 at 3). In other words, Lisa was potentially at fault for A.A. not wearing a seatbelt and Lewis wanted Burke to take steps to lessen the fault which might be allocated to Lisa. Lewis also "beg[ged]" Burke to join in a motion for summary judgment regarding the fault of the driver of the horse trailer. (Doc. 70-18 at 9). Again, doing so would have lessened Lisa's liability. If Brandon had been completely invested in prevailing against Lisa, Lewis's repeated attempts at lessening Lisa's liability would have made little sense.

It appears Brandon and all the defendants except for Lisa engaged in serious litigation for several years. Eventually, a mediation was scheduled for August 20, 2015. On August 17, 2015, Burke emailed Lewis to explain he had "multiple calendar conflicts" with the mediation. Burke then stated "[c]oupling [the calendar conflicts] with the fact that Lisa's liability insurer remains willing to pay the available policy limits to settle claims against her," meant Burke would not be attending the mediation. Burke then wished Lewis well "in trying to get a settlement with the other defendants." Lewis sent a lengthy response.

Lewis's response began by stating he needed "to correct a misunderstanding." In his view, Country Mutual had "never offered to settle." Next, Lewis alleged Country Mutual had done "nothing to resolve the case, and worse yet, [done] nothing to defend Lisa." Instead, Country Mutual had "unilaterally declared that they are going to freeload off of our experts." (Doc. 70-8 at 3). In fact, Country Mutual allegedly had "not lifted a finger or spent a dime to protect its policyholder either by settlement or defense." Lewis explained they were "hoping to explore a partial resolution at the mediation" but Country Mutual would have to show up for that take place. Burke then responded:

> We should talk, again. We talked long ago about experts, among other discussions. I bring that particular talk up in response to your "freeload" comments. You're saying things here that really catch me off guard for lots of reasons. . . . [N]either I nor Country was important to the real goal [at the mediation] for your clients . . . I again wish you the best on Thursday, and I hope soon thereafter we can clear the air on what you have said.

(Doc. 70-8 at 3).

The next day—August 19, 2015—Lewis sent Burke a letter. The letter began as follows:

> We write this letter because we are concerned that [Country Mutual] has breached its obligations under the policy to Lisa. We have a solution though. We received your disclosures stating you planned on sharing our experts. You are not going to do that because you did not pay for them. [Country Mutual] should have done more to defend Lisa by pursuing more of an allocation of fault to [engineering and construction firms] and the County. Furthermore, [Country Mutual] has done nothing to try and resolve this case. It has never even offered the limits of coverage. . . . It is surprising that [Country Mutual] has never even offered the money.

The letter then proposed a settlement requiring Country Mutual do the following: pay the policy limits (*i.e.*, $30,000), pay the costs associated with the probate proceedings in state court, reimburse Brandon for all the experts Burke planned to share (approximately $300,000), pay "all future expert fees, travel costs of experts, and litigation costs through trial, take a more active role in defending the allegations of fault by the other defendants, pay for focus groups (no more than $50,000), and pay for a jury consultant." The letter stressed that Brandon was "only asking this insurance company not to free load off of him and to pay what it should have been paying all along." (Doc. 70-7). Burke did not accept that settlement.[4]

Brandon and the other defendants attended the mediation on August 20. Burke did not attend but he did send his law partner. Burke's partner left before the mediation with the other defendants ended. (Doc. 68 at 338). Towards the end of the mediation, Lewis sent Burke an email. That email provided in full (errors in original):

> We are at the mediation and it is getting close to the end. As I explained earlier today and on our recent telephone call. Consistent with your discussions with [the mediator], the opportunity to resolve the claim within the policy limits giving Lisa covenant not to execute expires today at 6 o'clock.
>
> I will send you the case saying that that is a reasonable settlement opportunity during mediation after litigation has been pending for a while.

---

[4] This settlement offer was never communicated to Lisa. (Doc. 76 at 9).

(Doc. 70-8). According to Brandon, the intent behind that email was to offer a settlement "just for the policy limits" that would "not include the payment of any costs." (Doc. 70-1 at 4). That description is in significant tension with other evidence in the record. In particular, during his deposition Lewis stated the offer was for more than the $30,000 policy limits. It appears Burke interpreted the offer as being equivalent to the offer in Lewis's August 19 letter. (Doc. 70-4 at 18). It is undisputed Burke did not respond to the email and the offer, whatever it was, expired. The mediation eventually ended with Brandon settling with the construction firm, engineering firm, and the County. (Doc. 70-1 at 4).

Sometime after the mediation, Brandon settled with the driver of the truck. That settlement left Lisa as the sole defendant. On October 27, 2015, Lewis made another settlement offer to Burke. That offer, contained in an email to Burke, began by stating counsel was "certain that [Country Mutual] has breached it [sic] duties to [Lisa]." Again, Lewis stressed that Burke's failure to disclose independent experts meant he was trying to "free load[] off of [A.A.] and his family." Lewis believes "[A.A.] does not owe [Country Mutual] a free ride." Thus, Lewis proposed a settlement consisting of the $30,000 liability limits, the $30,000 underinsured motorist limits, one-half of the expert fees ($84,510.96), and one-half of the court reporter fees ($6,866.91). (Doc. 68 at 306). The email also stated "[t]o this day you have never tendered the policy limit." On October 30, 2015, Burke made a counter-offer.

Burke's counter offer was for the "15/30 liability limits of Lisa's policy," along with the "15/30 [underinsured motorist] coverage," and "$15,000 for litigation expenses incurred." (Doc. 68 at 310). That offer was not accepted. On April 28, 2016, Lewis sent a letter outlining another possible settlement offer. That offer was structured around setting up a subsequent bad faith claim against Country Mutual. The letter outlining the offer, however, stated "I do not have authority to enter into this agreement." Thus, it was not a true settlement offer that could have been accepted. The litigation continued.

There was another mediation on May 25, 2016. Prior to that mediation, Country

Mutual authorized payment of up to $100,000 beyond the policy limits. (Doc. 76 at 18). Brandon made a settlement demand during the mediation "for an amount roughly equivalent to the costs incurred in the underlying litigation." (Doc. 68 at 339). Country Mutual did not accept the offer. The parties have not explained how the litigation progressed after that failed mediation. The next date identified by the parties is April 3, 2017. On that date Lisa executed a "Settlement Agreement and Assignment." (Doc. 68 at 336). That agreement provided a judgment for $30 million dollars would be entered against Lisa but there would be a covenant not to execute. (Doc. 68 at 342). Lisa assigned all her claims against Country Mutual to an entity that had been appointed as guardian ad litem for her injured sons. (Doc. 68 at 343).

In August 2017, Country Mutual filed the complaint at issue in the present case. That complaint named as defendants the guardian ad litem, Brandon, and the children (collectively, "Defendants") (Doc. 1). The complaint sought declaratory judgment that Lisa had breached the cooperation clause by entering into the settlement agreement such that the settlement agreement was "invalid, noncompliant, nonbinding and/or unenforceable." (Doc. 1 at 14). Defendants filed their answer along with a counterclaim also seeking declaratory judgment. According to Defendants, they are entitled to a declaratory judgment that Country Mutual "breached the insurance contract with Lisa."[5] (Doc. 12 at 22).

On November 30, 2018, the parties filed cross-motions for summary judgment. Greatly simplified, Country Mutual seeks summary judgment that Lisa breached the cooperation clause of the insurance policy while Defendants seek summary judgment that Country Mutual committed an anticipatory breach such that Lisa was free to enter into the settlement agreement.

**ANALYSIS**

The parties' cross-motions for summary judgment present a wide variety of

---

[5] Before the present case was filed, the guardian ad litem and Brandon had filed a declaratory judgment action in state court. In that case, the guardian ad litem and Brandon demanded a jury trial. (CV-17-2997, Doc. 1-1 at 55). Eventually that case was removed to this court and consolidated with the current case. (Doc. 18).

assertions and arguments about what is or is not allowed under Arizona law. Based on the briefing, however, it appears the case comes down to a single question: did Country Mutual breach any of the obligations owed to Lisa such that she could enter into the settlement agreement? Viewed in the light most favorable to Defendants, Country Mutual did not.[6]

## I. Country Mutual Did Not Breach Its Duties

Country Mutual owed Lisa three duties: the duty to treat settlement proposals with equal consideration, the duty to defend, and the duty to indemnify. *Arizona Prop. & Cas. Ins. Guar. Fund v. Helme*, 735 P.2d 451, 459 (Ariz. 1987). In general, if Country Mutual breached any of these duties, Lisa was free to enter into the settlement agreement. *Id.* Here, Defendants argue Country Mutual "breached all three duties." (Doc. 69 at 5).

### A. Duty of Equal Consideration

"The insurer owes the insured an implied contractual duty to treat settlement proposals with equal consideration to its interests and those of an insured." *Safeway Ins. Co. v. Guerrero*, 106 P.3d 1020, 1024 (2005). The test for "determining whether an insurer has given consideration to the interests of the insured . . . is whether a prudent insurer without policy limits would have accepted the settlement offer." *Clearwater v. State Farm Mut. Auto. Ins. Co.*, 792 P.2d 719, 723 (Ariz. 1990). Crucially, Defendants concede this test is only triggered when there are "offers to settle the claims against the insured *within coverage of the policy*."[7] (Doc. 69 at 6-7) (emphasis added). In other words, Country

---

[6] Defendants also filed a motion to strike Country Mutual's expert. Because this Order does not rely on either side's expert witness, granting summary judgment in Country Mutual's favor renders the motion to strike moot.

[7] Defendants appear to retreat from this position in their reply. According to the reply, Country Mutual's position that "an insurer's duty to give equal consideration is limited to offers within the 'policy limits' . . . simply is not the law." (Doc. 83 at 5). Defendants do not cite a single Arizona case involving a breach of the duty of equal consideration involving demands for more than policy limits. Admittedly, there is a difficult question how the duty applies, if at all, when an insurer is faced with multiple claimants and "the combined demands of the claimants exceed the policy limits." *State Farm Mut. Auto. Ins. Co. v. Mendoza*, 432 F. Supp. 2d 1017, 1019 (D. Ariz. 2006) (certifying question to Arizona Supreme Court); *State Farm Mut. Auto. Ins. Co. v. Mendoza*, CV-02-1141, Doc. 213 (Arizona Supreme Court declining to accept certified question). But Defendants' statement in their motion that the duty of equal consideration is triggered only by a settlement offer within policy limits means the Court need not address the undecided question of Arizona law of what to do with settlement offers beyond policy limits. *Cf. McReynolds v. Am. Commerce Ins. Co.*, 235 P.3d 278, 280 (Ariz. Ct. App. 2010) ("There is no Arizona case that directly sets forth the standard applicable when an insurer is faced with multiple claims

- 10 -

Mutual breached the duty of equal consideration only if Defendants made a settlement offer within the policy limits. Defendants never did so.

Defendants point to three settlement offers which they argue were within the policy limits. Those offers were on August 19, 2015, August 20, 2015, and October 27, 2015. (Doc. 69 at 8-10). Two of those offers—August 19 and October 27—obviously included offers that Country Mutual pay part of Brandon's litigation costs. Because the policy did not require Country Mutual pay Brandon's litigation costs, those offers were not within policy limits and their rejection did not breach the duty of equal consideration. As for the August 20 settlement offer, Defendants now describe that offer as *not* including any amounts beyond the policy limits. But the underlying evidence establishes the August 20 offer still included amounts beyond the policy limits.

### i.   August 19 & October 27 Offers

The August 19 and October 27 settlement offers both contemplated Country Mutual pay substantial amounts beyond the policy limits in the form of "litigation costs." The August 19 offer was for Country Mutual to pay the policy limits plus some portion of Brandon's already-incurred expert fees (approximately $300,000), as well as "all future expert fees, travel costs of experts, and litigation costs through trial, . . . focus groups (no more than $50,000), and . . . a jury consultant." The October 27 offer was for the policy limits as well as half of the expert fees ($84,510.96) and one-half of the court reporter fees ($6,866.91). Defendants now argue both of these settlement offers should be viewed as simply demanding the "policy limits." Defendants' argument is hard to follow and, to the extent the Court can understand it, the argument conflicts with the plain language of the policy.

The Country Mutual policy included a provision that "[i]n addition to the limits of liability stated on the declarations page, we will pay . . . all expenses we incur and all court costs assessed an insured as a result of a lawsuit we defend." This meant Country Mutual was obligated to pay for two types of costs 1) "expenses we incur" and 2) "all court costs

in excess of its policy limits.").

assessed an insured." Defendants focus on the first type and argue Country Mutual "incurred the costs" outlined in the August 19 and October 27 offers "because the costs were primarily for experts that Brandon retained to support fault against the road design defendants and [the driver of the truck]." (Doc. 69 at 8). Defendant do not provide a clear explanation why the fact that Brandon's experts were not aimed at imposing fault on Lisa meant the costs qualified as "expenses [Country Mutual] incur[red]." Country Mutual did not hire or pay for Brandon's experts. And if those experts were not paid, they could not turn to Lisa or Country Mutual for payment. *See Samsel v. Allstate Ins. Co.*, 59 P.3d 281, 284 (Ariz. 2002) (noting "'[i]ncur' is generally accepted to mean 'to become liable for'"). The litigation costs outlined in the August 19 and October 27 demands were not incurred by Country Mutual.

Beyond claiming Country Mutual was obligated to pay the costs under the language of the policy, Defendants also argue the costs were within the policy limits because of an agreement between Burke and Lewis. According to Defendants, "Lisa and Brandon agreed to use and to share the costs of liability experts" during an "August 1, 2013 meeting." (Doc. 69 at 8). That is not established by any evidence in the record. Defendants point to no evidence in the record that Burke agreed to bear the costs of the liability experts. In fact, the record is replete with evidence that Burke did not agree to such an arrangement.

In litigating Brandon's claims against Lisa, Lewis repeatedly argued to Burke that Country Mutual was trying to "free load" off Brandon. In August 2015—long after the alleged agreement whereby Burke agreed to bear some of the cost of the experts—Lewis stated Country Mutual had "unilaterally declared that they are going to freeload off of our experts." (Doc. 70-8 at 3). Also in August 2015, Lewis claimed Brandon's demand for litigation costs was "only asking [Country Mutual] not to free load off of him and to pay what it should have been paying all along." (Doc. 70-7). Finally, in October 2015, Lewis told Burke his designating the same experts as Brandon was "free loading off of [A.A.] and his family. [A.A.] does not owe [Country Mutual] a free ride." These statements are wishful thinking on Lewis' part and they are unequivocal evidence that Burke did not agree

to bear the litigation costs in August 2013 as Defendants claim.[8]  If there had been an agreement as of August 2013, Lewis's communications would have demanded payment, not complained about freeloading.  Thus, the litigation costs included in the August 19 and October 27 offers were not expenses Country Mutual incurred as required by the policy language.

Defendants' fallback position is that Country Mutual admitted the costs outlined in the August 19 and October 27 settlement offers were covered by the policy language. Defendants cite to statements by in-house counsel for Country Mutual allegedly admitting the costs were covered by the policy.  (Doc. 69 at 8).  Those statements, however, do not indicate the costs in the settlement offers were covered.  Rather, they merely indicate that *some* costs are covered by the policy, such as expenses Country Mutual incurred or costs eventually assessed against an insured.  The alleged concession that the policy covered some additional amounts beyond the "policy limits" is obviously true but entirely irrelevant to whether the particular costs Lewis was demanding were covered.  Those costs were not covered and the settlement offers including such costs were not within the policy limits.

Finally, Defendants argue that Country Mutual "waived its right to contest that costs are not covered when it extended coverage, but did not assert a reservation of rights." (Doc. 69 at 9).  As best as the Court can tell, Defendants believe Country Mutual's settlement offer that included a small additional amount to cover litigation costs somehow permanently bound Country Mutual to the position that *all* costs were covered by the policy.  Defendants have no legal support for this position and it is close to frivolous.

Neither the August 19 nor October 27 settlement offers were within the policy limits.  Thus, Country Mutual did not breach the duty of equal consideration by rejecting them.

---

[8] Moreover, even assuming Burke had agreed to share in the expert costs, the August 19 settlement demand contained much more than simply the costs of the experts.  That demand included up to $50,000 for "focus groups" as well as the cost of a "jury consultant." Defendants point to no evidence Burke ever agreed to bear those costs.  Similarly, the October 27 settlement demand required Country Mutual pay costs associated with experts and court reporters.  Defendants cite no evidence Lewis and Burke reached an agreement regarding costs associated with court reporters.

ii.     **August 20 Demand**

Defendants claim the email from Lewis to Burke sent on August 20 was a settlement offer solely for the policy limits.  As previously quoted, that email stated in full:

> We are at the mediation and it is getting close to the end.  As I explained earlier today and on our recent telephone call. Consistent with your discussions with [the mediator], the opportunity to resolve the claim within the policy limits giving Lisa covenant not to execute expires today at 6 o'clock.
>
> I will send you the case saying that that is a reasonable settlement opportunity during mediation after litigation has been pending for a while.

This email presents two issues.  First, does Arizona's mediation privilege prevent the Court from considering it?  Second, if the Court can consider the email, was it an offer to settle for the policy limits (*i.e.*, approximately $30,000 in liability and $30,000 in uninsured/underinsured) or was it a variation on earlier settlement demands involving payment of additional costs?

a.     **Arizona's Mediation Privilege Does Not Bar Consideration of the Email**[9]

Arizona's mediation privilege provides:

> The mediation process is confidential. Communications made, materials created for or used and acts occurring during a mediation are confidential and may not be discovered or admitted into evidence unless one of the following exceptions is met:
>
> 1. All of the parties to the mediation agree to the disclosure.
>
> 2. The communication, material or act is relevant to a claim or defense made by a party to the mediation against the mediator or the mediation program arising out of a breach of a legal obligation owed by the mediator to the party.
>
> 3. The disclosure is required by statute.
>
> 4. The disclosure is necessary to enforce an agreement to mediate.

---

[9] This case does not involve any federal claims.  Therefore, pursuant to Federal Rule of Evidence 501, Arizona's privilege law applies.  *Cf. In re TFT-LCD (Flat Panel) Antitrust Litig.*, 835 F.3d 1155, 1159 (9th Cir. 2016) (concluding federal privilege law applied because the negotiations involved both federal and state claims).

- 14 -

> 5. The disclosure is made in a report to a law enforcement officer, the department of child safety or adult protective services by a court appointed mediator who reasonably believes that a minor or vulnerable adult is or has been a victim of abuse, child abuse, neglect, exploitation, physical injury or a reportable offense.

Ariz. Rev. Stat. Ann. § 12-2238(B). The Arizona Court of Appeals has interpreted this statute as providing "a broad screen of protection that renders confidential all communications . . . made as part of the mediation process." *Grubaugh v. Blomo ex rel. County of Maricopa*, 359 P.3d 1008, 1011 (Ariz. Ct. App. 2015). The privilege is meant to "encourage[] candor with the mediator throughout the mediation proceedings by alleviating parties' fears that what they disclose in mediation may be used against them in the future." *Id.* at 1012. The parties have not cited, and the Court has not located, any Arizona authority addressing the applicability of the privilege to facts similar to the present case involving communications to a party after that party left a mediation. The Court, therefore, must conduct its own statutory analysis.

Under Arizona law, the interpretation of statutory language begins with the "plain meaning of the language." *Grubaugh*, 359 P.3d at 1010. "To determine the plain meaning of a term in a statute, courts refer to established and widely used dictionaries." *State v. Lychwick*, 218 P.3d 1061, 1063 (Ariz. Ct. App. 2009). If a plain meaning can be derived, it must be applied "unless such an application will lead to absurd or impossible results. *Grubaugh*, 359 P.3d at 1010.

The mediation privilege protects all "[c]ommunications . . . during a mediation." The parties agree the August 20 email qualifies as a "communication." Accordingly, the crucial question is whether the email was sent "during a mediation." The Oxford English Dictionary defines "during" as "[t]hroughout the whole continuance of; hence, in the course of, in the time of." The Merriam-Webster dictionary defines "during" as "throughout the duration of." Inputting these definitions into the statute would mean *any* communications made "throughout the whole continuance" of the mediation would be privileged. That definition would seem to mean the email cannot be considered.

It is undisputed the mediation between Brandon and all of the defendants except for Lisa was still ongoing at the time Lewis sent his email. Thus, in one sense the email from Lewis to Burke was sent "during a mediation." But "during a mediation" must be carefully defined when there is a multi-party mediation. In a multi-party situation, "during a mediation" can only sensibly refer to an ongoing mediation involving the parties who are communicating. In other words, merely because the mediation between Brandon and the other defendants was ongoing did not mean Lewis's communications with everyone was privileged. For example, if Lewis and the other defendants had agreed to a mediation but Burke had never agreed to participate, Lewis's communications with the parties involved in the mediation would be privileged but his communications with Burke would not. The mediation privilege should not be read as extending the privilege to communications between parties not actually involved in mediation.

Similarly, even if parties are involved in mediation and the privilege prevents disclosure of some of their communications, the mediation privilege must end at some point. That is, the parties who participate in a mediation cannot draw a permanent cloak of privilege around all their subsequent communications. As recognized by another court applying an alleged federal mediation privilege, negotiations *after* a mediation are not protected by the mediation privilege. *Folb v. Motion Picture Indus. Pension & Health Plans*, 16 F. Supp. 2d 1164, 1180 (C.D. Cal. 1998). "A contrary rule would permit a party to claim the privilege with respect to any settlement negotiations so long as the communications took place following an attempt to mediate the dispute." *Id.* Accordingly, the mediation privilege cannot apply to communications after a mediation ends.

Combining the rule regarding multi-party mediation and that the privilege does not apply after a mediation ends means the privilege does not apply to communications between parties who participated in a mediation but the mediation between them ended, even if other parties are still participating in a mediation. Here, once the mediation between Brandon and Lisa ended, the mediation privilege had no application to communications between their representatives. At the time the August 20 email was sent, it is undisputed

Burke's partner had left the mediation with no intention to return. His departure from the mediation meant the mediation between Brandon and Lisa had ended, despite the mediation continuing between Brandon and the other defendants.[10] And because the mediation between Brandon and Lisa had ended, the mediation privilege does not bar consideration of the August 20 email. There is, however, one final complication.

The August 20 email references communications undoubtedly made "during" the mediation, *i.e.*, when Burke's partner was still at the mediation and participating. The email included statements that Lewis had explained a particular offer during the mediation and on a phone call as well as a statement that the offer was consistent with what had been presented to the mediator. These statements reference the mediation and communications that occurred during the mediation. Thus, those statements are not admissible.

Consistent with the mediation privilege, the Court will consider the email as consisting only of the following:

> [T]he opportunity to resolve the claim within the policy limits giving Lisa covenant not to execute expires today at 6 o'clock.
>
> I will send you the case saying that that is a reasonable settlement opportunity . . . after litigation has been pending for a while.

Whether this email qualified as a within-policy-limits offer is the next issue.

### b. Meaning of the Email

The parties offer different interpretations of the email. When viewed in context, however, the evidence establishes there is no genuine dispute of fact that the email was not a within-policy-limits offer. Burke did not interpret the email as a within-policy-limits offer. And most crucially, Lewis—the author of the email—admitted during his deposition that it was not meant as a within-policy-limits offer. No reasonable factfinder could conclude the email was something neither the sender nor receiver interpreted it to be.

According to Defendants' summary judgment filings, the email was an offer to settle for the "policy limits," defined as the $30,000 liability limits and $30,000

---

[10] If Country Mutual had represented that, from its perspective, it remained an active participant in the mediation, the question would be different.

uninsured/underinsured limits.  In support of this position, Defendants point to an affidavit by Brandon.  There, Brandon states:

> Towards the end of the mediation on August 20, 2015, when it looked like I was able to settle with the Roadway Defendants I authorized my attorney Robert Lewis to make a demand for Lisa Ackert's policy limits in exchange for a covenant not to execute.  I have personal knowledge of the contents of the offer.  This offer was just for the policy limits and did not include the payment of any costs.

(Doc. 70-1 at 4).[11]  Brandon's statement regarding the intent behind the email is in significant tension with the surrounding evidence.  But more importantly, Brandon's intent

---

[11] It is possible to read statements by Lewis during the deposition of Burke as supporting this view.  Those statements, however, were not under oath and are not competent summary judgment evidence.  But even if they were, the statements are cryptic.  (The deposition transcript is difficult to follow because Lewis was deposing Burke and Lewis often asked questions based on Lewis's personal knowledge of what happened in the underlying litigation.)  During his deposition, Burke was asked by Lewis about the terms of the August 20 offer.  Lewis asked Burke whether he knew that, during the early part of the mediation, Lewis and gone to Burke's partner "and said we want to settle the terms similar to [the August 19 letter], or the terms of this letter, please give us a counteroffer and negotiate this?"  Burke stated he was unaware that Lewis had asked for a counteroffer.  (Doc. 68 at 124).  Following Burke's answer, the following exchange occurred:

> **Question by Lewis**:  But you had a conversation with [your partner] when he was at the mediation, and at that time the settlement proposal to Country Companies was the contents or conditions similar to the August 19th letter; correct?
>
> **Burke**: Yes.
>
> ***
>
> **Question by Lewis**: So at that point, after there was a resolution, or close to a resolution with the road design defendants, we continued negotiations with [Burke's partner].  And we offered to settle for the policy limit in exchange for a covenant, and Country Companies just had to continue defending Lisa, and we were going to focus on going after [the driver of the horse trailer].  Was that offer ever communicated to you?
>
> **Burke**: No.

(Doc. 68 at 124).  The question by Lewis whether the "offer was ever communicated" to Burke is confusing because the August 20 email was sent by Lewis directly to Burke.  So it appears Lewis must be speaking of some *other* offer.

regarding the terms of the offer is not controlling. Rather, the language of the email, what Lewis meant that language to communicate and what Burke interpreted it to mean is what matters.

The circumstances surrounding the email establish the offer to settle for "policy limits" involved more than merely the liability limits and uninsured/underinsured limits. To begin, the alleged offer for "policy limits" was in the same email chain as Burke's email stating the policy limits were available if Brandon wished to settle. On August 17, Burke sent an email to Lewis stating, in relevant part, Country Mutual "remains willing to pay the available policy limits to settle the claims against [Lisa]." Given Burke's statement that Country Mutual was willing to pay the policy limits, it would have been strange for Lewis to make a very time-limited settlement demand for the amount Burke had long shown a willingness to pay.

Beyond allegedly demanding something Burke stated Country Mutual was willing to pay, the August 20 email also claimed settling for "policy limits" was a "reasonable settlement opportunity . . . after litigation has been pending for a while." Again, given Burke's willingness to settle for policy limits a few days earlier, it would have made little sense for Lewis to argue that a settlement for policy limits was "reasonable." Burke did not need to be convinced that payment of the amount Country Mutual wanted to pay would be reasonable.

Similarly, Lewis's statement that he would "send [Burke] the case" establishing the settlement offer was reasonable is difficult to understand if the demand truly was merely for the policy limits. Burke had spent decades representing Country Mutual's insureds. Given that experience, the amount of damages at stake, and Burke's stated willingness to pay the policy limits, Burke would not have needed to review any authority to conclude a settlement offer for the policy limits was a reasonable result. Defendants offer no explanation why Lewis believed he needed to send Burke "the case" merely to establish a payment of policy limits was reasonable.

More evidence that Lewis had in mind more than the "policy limits" (defined as the

liability and uninsured/underinsured limits) is found in his August 19 letter. In that letter, Lewis outlined his view of what the Country Mutual policy covered. (Doc. 70-7 at 2). According to Lewis, "[t]he duty to defend includes payment of all reasonable necessary litigation costs." (Doc. 70-7 at 2). In connection with that, Lewis asserted Country Mutual should have been paying for the experts Brandon had retained. In other words, Lewis believed the litigation costs Brandon had incurred were actually payable as part of Country Mutual's "policy limits." An email from Lewis a few months later made this abundantly clear.

In an October 2015 email, Lewis made a settlement demand for Country Mutual to pay approximately $85,000 in expert fees and approximately $7,000 in court reporter fees. Lewis stated "[a]s you know, litigation costs are covered by the policy." Accordingly, Country Mutual "should have been paying [these costs] all along." Lewis believed he was making a settlement demand for Country Mutual to "simply honor[] its promises under the insurance policy contract." Lewis ended the email by stating Country Mutual would "not be given another opportunity to settle this [case] *within coverage*." (Doc. 70-10) (emphasis added). Thus, Lewis believed Country Mutual's "policy limits" included payment of certain litigation costs.[12]

The foregoing evidence supports Country Mutual's position that the August 20 email was not a simple "policy limits" demand as both before and after the email, Lewis was using a definition of "policy limits" that included payment of Brandon's litigation costs. If Lewis's communications were all the available evidence, however, a trial might be necessary. But the final pieces of evidence are sufficiently compelling that, even on their own, the August 20 email must be viewed as asking for more than policy limits, as claimed by Country Mutual.

During his deposition, Burke was asked about the terms of the August 20 email. (Doc. 68 at 125). After referencing the email, Burke was asked whether an offer for only

---

[12] At summary judgment, Defendants argued the August 19, 2015 offer was a "valid settlement offer[] within coverage." (Doc. 78 at 2). That means Defendants believe *all* the demands in the August 19 letter could be classified as the "policy limits." Defendants' expert also concluded the August 19 letter "was a 'within limits' offer." (Doc. 70-4 at 21).

the policy limits was "ever communicated to [him]." Burke states it was not. Given that it is undisputed Burke received the August 20 email, he must not have interpreted that email as a within-policy-limits offer.

Similarly, Lewis was asked during his deposition about the August 20 email. Lewis's deposition testimony makes clear the email was a settlement offer for the "policy limits" as Lewis meant that term, *i.e.* including an amount of litigation costs. Accordingly, Lewis described the email offer in the following significant manner:

> So the settlement offer that was contained in this email was to pay the policy limits. There was no past cost associated with it. There was a covenant not to execute instead of a release. But there had to be a commitment from Country Mutual to meaningfully participate in the defense going forward, ***which included paying for some of the expert costs.***

(Doc. 68 at 294) (emphasis added).[13] Lewis, as the author of the email, did not believe the email contained an offer only for the policy limits without litigation costs. Instead, the offer was for Country Mutual to pay the liability limits and "some of the [future] expert costs." Defendants have not explained how Country Mutual, upon receiving this email, acted unreasonably by reading it to be a settlement offer for more than the policy limits, the precise meaning its author intended. Because the August 20 settlement offer was not a within-policy-limits offer, Country Mutual did not breach the duty of equal consideration by rejecting it.

**B. Duty to Defend**

Defendants' next argument is that Country Mutual's defense of Lisa included a breach of the duty to defend. An insurer has a duty to defend its insured from "any claim potentially covered by the policy." *United Servs. Auto. Ass'n v. Morris*, 741 P.2d 246, 250 (Ariz. 1987). "Claims of breach of the duty to defend normally arise after the insured asks the insurer to defend and the company declines to act." *Holt v. Utica Mut. Ins. Co.*, 759

---

[13] Given this deposition testimony, Defendants carefully describe the August 20 settlement offer as "an offer to settle for the policy limit without *reimbursement* of costs." (Doc. 83 at 7). While the offer might not have been seeking reimbursement of previously paid costs, Lewis admitted the settlement offer required Country Mutual pay for future expert costs. The Country Mutual policy, however, did not cover Brandon's past or future expert costs.

P.2d 623, 628 (Ariz. 1988).  But Arizona courts have found breaches of the duty to defend in other circumstances.  For example, one insurer received a copy of a complaint against its insured but "did not explicitly deny coverage or directly refuse to defend."  *Id.*  That behavior created a question of fact whether the insurer breached the duty to defend.  *Id.* at 628-29.  Another insurer that might have "assumed the duty of defense" possibly breached the duty by failing "to file a timely answer.  *Lloyd v. State Farm Mut. Auto. Ins. Co.*, 860 P.2d 1300, 1305 (Ariz. Ct. App. 1992).  Existing authority, however, draws a clear distinction between an insurer taking no action to defend its insured and an insurer retaining counsel to defend the insured.  In the latter circumstances, an insurer has discharged its duty to defend and any failures must be attributed to counsel, not the insurer.

The best Arizona authority on an insurer's duty to defend being fulfilled by the hiring of counsel is *Lloyd v. State Farm*.  *Id.*  There, Virginia Lloyd had been struck and severely injured "by a midget race car" partly owned by George and Sharon Lane.  The Lanes had an automobile insurance policy with State Farm.  *Id.* at 1301.  Lloyd later sued the Lanes and the Lanes believed State Farm would defend them.  There was some initial delay but eventually State Farm hired an attorney to defend the suit.  After the attorney began defending the Lanes, the attorney received a settlement demand from Lloyd.  The attorney forwarded the settlement demand to State Farm but did not inform the Lanes of the demand.  State Farm then concluded coverage did not exist and directed the attorney to withdraw.  *Id.*  Lloyd later obtained a default judgment against the Lanes along with an assignment of the Lanes' claims against State Farm.

Lloyd sued State Farm and argued State Farm had breached the duty to defend by, among other things, "failing to notify the Lanes about [the] settlement offer."  *Id.* at 1305. The Arizona Court of Appeals rejected that argument because, at the time of the settlement offer, State Farm had hired counsel for the Lanes.  According to the court, State Farm could not "be held liable for failing to notify the Lanes" of the settlement offer because the attorney State Farm had hired "represented the Lanes" at the time of the settlement offer.  *Id.*  "[H]aving hired [the attorney] to represent the Lanes, State Farm had no obligation to

notify the Lanes of the settlement offer . . . That obligation belonged to [the attorney]." *Id.*

Pursuant to *Lloyd*, an insurer cannot be found to have breached its duty to defend based on the failures of counsel. In general, once an insurer hires competent counsel and allows that counsel to perform as he deems appropriate, an insurer has discharged its duty to defend and cannot be liable for counsel's failures. Such failures must be attributed to counsel, not the insurer.[14] There may, of course, be exceptions to this general rule. For example, if an insurer were to retain unqualified counsel or specifically direct counsel to take inappropriate action, a court might find an insurer breached the duty to defend despite having formally hired counsel to defend the insured.[15] Those exceptions, however, do not change the general rule that the duty to defend is discharged by hiring counsel.

In the present case, it is undisputed Country Mutual timely hired Burke to defend Lisa in the underlying suit. Defendants do not argue Burke was unqualified nor do they point to evidence that Country Mutual directed Burke's litigation decisions. The record establishes Burke, exercising his independent judgment, made the strategic decisions regarding Lisa's defense. Defendants believe Burke's defense of Lisa was deficient but the remedy for that type of deficient performance is a malpractice action against Burke, not a claim that Country Mutual breached its duty to defend.[16] Burke's failures, whatever they may be, cannot be the basis for concluding Country Mutual breached its duty to defend.[17]

---

[14] Whether the failures of counsel hired by an insurer should be attributable to the insurer is a "legal issue that has divided the courts." George M. Cohen, *Liability of Insurers for Defense Counsel Malpractice*, 68 Rutgers U.L. Rev. 119, 125 (2015). Some jurisdictions recognize "vicarious liability" in this context but "a majority of jurisdictions have rejected vicarious liability of liability insurers, and to the extent that one can identify a 'trend' in the case, almost all of the more recent cases, as well as most cases decided by the larger jurisdictions, reject vicarious liability." *Id.*

[15] The most recent version of the proposed Restatement of the Law of Liability Insurance states an insurer can be held liable for the negligent acts of counsel if, and only if, the insurer does not exercise reasonable care in selecting counsel or if the insurer directs counsel in the performance of his duties. Restatement of the Law of Liability Insurance § 12 PFD No 3 REV (2018).

[16] A malpractice suit based on failures in defending an insured has been attempted at least once. *See Botma v. Huser*, 39 P.3d 538, 540 (Ariz. Ct. App. 2002). That attempt failed because the insured tried to assign his malpractice claims and such claims cannot be assigned.

[17] Defendants believes *Parsons v. Continental National American Group*, 550 P.2d 94 (Ariz. 1976), establishes an insurer breaches its duty to defend "by providing a defense that is tainted by conflict." (Doc. 69 at 11). But *Parsons* did not involve the duty to defend in the way Defendants believe. Rather, *Parsons* involved an insurer that had engaged in

## C. Duty to Indemnify

Defendants' final arguments involve the duty to indemnify. That duty requires an insurer "indemnify the insured for covered claims." *Colorado Cas. Ins. Co. v. Safety Control Co.*, 288 P.3d 764, 769 (Ariz. Ct. App. 2012). Defendants argue Country Mutual breached this duty in two ways. First, Country Mutual "failed to settle based on an erroneous coverage position." Second, Country Mutual "failed to affirmatively offer the policy limits to [Brandon]." (Doc. 69 at 14). Neither argument is convincing.

Defendants' argument regarding an "erroneous coverage position" is that the policy language itself covered the litigation costs Brandon incurred. As set out above, the policy language cannot be read as requiring Country Mutual pay for those costs. Thus, Country Mutual's coverage position was correct and there was no breach of the duty to indemnify based on the refusal to pay the costs Brandon demanded.

Defendants' second argument is that, pursuant to *Fulton v. Woodford*, 545 P.2d 979 (Ariz. Ct. App. 1976), Country Mutual had an obligation "to affirmatively tender the policy limits" because the damages exceeded the policy limits and Lisa's liability was clear. (Doc. 69 at 14). Defendants are correct that, under some circumstances, an insurer has an "obligation to initiate and attempt settlement."[18] *Id.* at 984. That obligation exists when "there is a high potential of claimant recovery and a high potential of damages exceeding policy limits." *Id.* In the present case, Brandon's own arguments in the underlying litigation conflict with his present claim that Country Mutual had an obligation to immediately offer the policy limits. That is, one of Brandon's central strategies in the underlying litigation was to argue Lisa was not at fault. In fact, according to Brandon's own expert on the cause of the crash, Lisa behaved reasonably. (Doc. 68 at 186). Given that position, Defendants' current position that there was a "high potential" Lisa would be

---

improper communications with the counsel hired to defend its insured. Those improper communications meant the insurer was "estopped to deny coverage" and deemed to have waived a policy exclusion. *Id.* at 97. *Parsons* has no application to the present facts because Country Mutual never denied coverage nor did it invoke a policy exclusion.

[18] It is unclear whether an insurer that fails to pursue settlement breaches the "duty to indemnify" or breaches some other duty, such as the duty of equal consideration. Solely for purposes of the present Order, the Court will assume Defendants are correct that it is the "duty to indemnify" at issue when an insurer fails to proffer the policy limits.

deemed liable for an amount exceeding policy limits is weak.

In light of the circumstances of the accident, however, a reasonable factfinder could conclude there was a "high potential" Lisa would be liable for more than the policy limits. That is, Lisa had approximately four seconds to try to avoid the horse trailer and during that time, she took her foot off the accelerator but made no effort at braking or swerving. There is also no dispute that the damages resulting from the accident were astronomical. Thus, Country Mutual perhaps should have immediately offered the policy limits. But Country Mutual discharged whatever duty it had through its course of dealings with Lisa.

The accident happened on March 27, 2012. A Country Mutual adjuster contacted Lisa shortly after the accident and attempted to contact Brandon but was unsuccessful. (Doc. 70-32 at 8, 10). The adjuster explained she was trying to reach Brandon to schedule a "personal visit" where she would have talked to him "in person, face to face, and [gone] over what I would need to settle the boys' injury claims in the event he chose not to get legal representation for them." (Doc. 70-32 at 11). Because Country Mutual did not even have Brandon's contact information, it was impossible for them to immediately offer the policy limits.

The first clear communications between Brandon and Country Mutual are a pair of letters in early June 2012. Brandon's attorneys sent a letter to Country Mutual on June 6, 2012, approximately two months after the accident. That letter requested information but made clear it should not be construed as "an attempt to settle this case and no settlement offer [was] on the table." The adjuster responded two days later, providing an ambiguous statement that may or may not have offered the policy limits:

> It does appear that the [sic] each child's claim will exceed our available coverage. The child in the vehicle that was hit also has a bill for a check up that she had as a result of the collision that will need to be considered when the division of the money is addressed. Court approval will be needed and the liens will need to be addressed as well.

(Doc. 68 at 157). Viewed in the light most favorable to Defendants, that was not an offer. At the very least, however, it was indication that Country Mutual was planning on paying

- 25 -

out the limits at some point in time.  Upon receiving that letter, Brandon knew the Country Mutual policy limits were available upon resolution of some procedural requirements. Thus, the letter is some evidence that Country Mutual was attempting to meet its obligations under *Fulton*.

In addition to the June 2012 letter, Country Mutual now argues it repeatedly offered the policy limits in 2013 and 2014.  Strangely, Country Mutual does not point to evidence establishing these offers.  Instead, Country Mutual cites to Brandon's deposition.   During his deposition, Brandon was asked whether he knew Country Mutual had offered the policy limits in 2013 and 2014:

> **Country Mutual's Counsel**: In 2013, were you aware of settlement offer made by Country Mutual for the $30,000 policy limits?
>
> **Brandon**: Yes.
>
> **Country Mutual's Counsel**: It was your understanding that Country Mutual had offered the policy limits?
>
> **Brandon**: Yes.
>
> **Country Mutual's Counsel**: Did you accept those?  I take it no?
>
> **Brandon**: No.
>
> **Country Mutual's Counsel**: Why not?
>
> **Brandon**: You're going to have to take that up with my lawyer.
>
> **Country Mutual's Counsel**: Were you aware that those policy limits were also offered in 2014?
>
> **Brandon**: Yes, sir.
>
> **Country Mutual's Counsel**: And you didn't accept them?
>
> **Brandon**: No.
>
> **Country Mutual's Counsel**: The reason -- as for the reasoning, I'd have to take it up with [Lewis]?
>
> **Brandon**: You got it.

(Doc. 76 at 47).

At the end of the deposition, Lewis attempted to undo those admissions:

**Lewis**: I think you got confused when [Country Mutual's counsel] was asking you some questions about settlement offers being made by Country Companies. He said 2013. You don't recall any -- do you recall any settlement offers in 2013?

**Brandon**: No.

**Lewis**: From Country Companies?

**Brandon**: No.

**Lewis**: 2014?

**Brandon**: No.

**Lewis**: The first time you got a settlement offer from Country Companies was in 2015?

**Brandon**: Correct.

(Doc. 76 at 53). The parties have not briefed whether Brandon was entitled to change his deposition testimony in this manner. It is doubtful Brandon was entitled to create a dispute of fact in this manner. *See, e.g.*, *Bush v. Compass Grp. USA, Inc.*, 683 F. App'x 440, 449 (6th Cir. 2017) ("Courts have repeatedly held that a plaintiff's internally contradictory deposition testimony cannot, by itself, create a genuine dispute of material fact."); *cf. Nelson v. City of Davis*, 571 F.3d 924, 928 (9th Cir. 2009) ("The rationale underlying the sham affidavit rule is that a party ought not be allowed to manufacture a bogus dispute with *himself* to defeat summary judgment."). At the very least, Brandon should have submitted some "reasonable explanation" for his shifting deposition testimony. *Yeager v. Bowlin*, 693 F.3d 1076, 1081 (9th Cir. 2012). Absent an explanation, Brandon's denials of his earlier deposition testimony qualify as a "sham" such that the Court may disregard the denials. And if Brandon's earlier testimony is accepted, Country Mutual complied with its duty to indemnify by repeatedly offering the policy limits relatively quickly after the accident.

Finally, assuming the Court were to ignore Brandon's admissions that offers were made, there is no genuine dispute of material fact that Country Mutual offered the policy limits in 2015 and then made repeated settlement offers for even more than the policy limits. Those offers were before Lisa concluded Country Mutual had breached the duty to

indemnify. Defendants seem to believe that because Country Mutual did not offer the policy limits immediately after the accident, Lisa became free to enter into the settlement agreement at any point in time. Defendants have not offered any Arizona authority in support of this strange position. While Defendants now argue a breach occurred as soon as 2012, Lisa did not act on that breach until 2015. By that point in time, Lisa had accepted Country Mutual's continued performance of its contractual duties for years. It would require an unwarranted extension of Arizona law to conclude an insured is entitled to claim "anticipatory breach" years after the fact, all while accepting other benefits of the contract in the interim. *See Indep. Nat. Bank v. Westmoor Elec., Inc.*, 795 P.2d 210, 216 (Ariz. Ct. App. 1990) ("Generally, when a party to a contract permits the breaching party to perform, he waives the breach."). By the time Lisa entered into the settlement agreement, Country Mutual had cured any alleged breach by repeatedly offering the policy limits. With no Arizona authority stating an insured can behave as Lisa did, her attempt to enter into the settlement agreement was a breach of the cooperation clause. *See Safeway Ins. Co. v. Guerrero*, 106 P.3d 1020, 1030 (Ariz. 2005) (holding any *Morris* agreement "outside the permitted parameters" is ineffective). No reasonable factfinder could conclude Country Mutual's failure to immediately and explicitly offer the policy limits was an anticipatory breach of Country Mutual's obligations.

Accordingly,

**IT IS ORDERED** the Motion for Summary Judgment (Doc. 67) is **GRANTED**.

**IT IS FURTHER ORDERED** the Motion for Summary Judgment (Doc. 69) is **DENIED**.

>>

>>

>>

>>

>>

>>

**IT IS FURTHER ORDERED** no later than **April 30, 2019**, the parties shall confer and file a joint proposed form of judgment resolving this case as well as the consolidated case.

Dated this 23rd day of April, 2019.

Honorable Roslyn O. Silver
Senior United States District Judge